## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| DONALD BROOKS, | : | |
| | : | |
| Plaintiff, | : | Case No. 1:25-cv-00865-MLB-JKL |
| | : | |
| v. | : | |
| | : | |
| GENERAL MILLS OPERATIONS, LLC, | : | |
| | : | |
| Defendant. | : | |

---

## AMENDED COMPLAINT

Plaintiff is a putative class member and unnamed plaintiff in separate class action litigation pending in this Court, Case No. 1:24-cv-02409-MLB-JKL. To preserve all rights related to his discrimination claims, Plaintiff filed his Complaint on February 18, 2025. (*See* Doc. 1) An Omnibus Scheduling Order was entered in this case specifically noting that there was no "alter[ation] or prejudice [to] Plaintiffs' rights under the Federal Rules of Civil Procedure[.]" (Doc. 9 at 9.)

Defendant filed a motion to dismiss under Fed. R. Civ. P. 12(b) on March 18, 2025. (Doc. 5.) No responsive pleading was filed prior to that date. (*See* Docket.) Plaintiff now files this Amended Complaint as a matter of course pursuant to Fed. R. Civ. P. 15(a)(1)(B).

## JURISDICTION AND VENUE

1.

Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1343(4), which confers original jurisdiction upon this Court in a civil action to recover damages or to secure equitable or other relief under any Act of Congress providing for the protections of civil rights, and pursuant to 28 U.S.C. § 1331, which confers original jurisdiction upon this Court in a civil action arising under the Constitution or laws of the United States.

2.

Plaintiff asserts claims under Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("§ 1981").

3.

Pursuant to 28 U.S.C. § 1391(b), § 1391(c), and N.D. Ga. L.R. 3.1, the Atlanta Division of this Court is the proper venue for Plaintiff's claims because Defendant is subject to this Court's personal jurisdiction, 28 U.S.C. § 1391(c)(2), and a substantial part of the events or omissions giving rise to the claim occurred within the Atlanta Division of this Court. *See also* N.D. Ga. L.R. 3.1(B)(1)(a) and 3.1(B)(3).

## PARTIES

### 4.

Plaintiff is a Black male and a former employee of Defendant who worked at General Mills' manufacturing facility in Covington, Georgia, until he was terminated around August 2023.

### 5.

Plaintiff is a citizen of the United States and resident of the State of Georgia; he submits himself to the jurisdiction of this Court.

### 6.

General Mills Operations, LLC ("Defendant" or "General Mills"), is a Delaware limited liability company with its principal place of business in Minneapolis, Minnesota, and was properly served by personal service of process upon its registered agent, National Registered Agents, Inc., 289 S. Culver Street, Lawrenceville, Georgia 30046.

## STATEMENT OF FACTS

### 7.

Brooks began work for General Mills around January 2023.

8.

Brooks worked in the Flake Department at West Plant.

9.

Brooks' Technician Team Leader ("TTL") was Jerry Sirmans.

10.

The Platform Lead over Brooks and Sirmans was Daniel Korpi, a white man and entrenched member of the Good Ole Boys who was favored by Good Ole Boys' co-founder, Jack Gilliam.

11.

Brooks repeatedly asked supervisor Sirmans and Level 5 Technician Thomas Riester for additional training, but they refused to provide it to him.

12.

Another black technician, William, was on the same team as Brooks and also had a problem receiving training and treatment equal to white employees.

13.

William warned Brooks that Sirmans, Riester, and Technician Jesse Sornes could not be trusted and would do things to get him in trouble.

14.

William requested to be moved because of his interactions with Riester, the Level 5 Technician on that team, and, after delay, he was eventually moved.

15.

Riester was the only Level 5 Technician on Brooks' team and his signature was required for a technician to advance to the next level.

16.

Even though Level 5 technicians are supposedly required to train lower level technicians, white supervisors do not actually require Level 5 technicians to properly train black employees.

17.

As a result, Brooks was trained by black Level 2 technicians, Lorenzo and Sheila Bass, who were not themselves adequately trained.

18.

Per standard procedure and policy, Brooks was supposed to advance from Level 1 to Level 2 after working at General Mills for six months. Nonetheless, Brooks never advanced to Level 2 because Riester would not agree to it.

19.

Riester said that General Mills could not afford to have all Technicians as Level 5 and explained why there were fewer black Level 5 Technicians by stating that "someone had to be" lower-level technicians on the floor.

20.

Brooks was frequently blamed for things that were not his fault. For instance, he was reprimanded for saving audits incorrectly, but any audits he saved could have been, and were, tampered with and altered by other employees.

21.

It was standard for white employees to blame or chastise black employees for various circumstances, like an alarm sounding; when that happened, white employees like Riester, Sornes, and Sirmans would have black employees do the work, but would not show them how to do the job and fully understand it.

22.

White employees worked together to conceal information from black employees so they do not understand the job and could not advance.

23.

Concealing information, refusing training, and forcing black employees to work and train others anyway created a dangerous situation for black employees

and also allowed white employees to easily find "mistakes" as reasons to justify terminating black employees.

24.

White employees expected Brooks and other black employees to handle equipment malfunctions and continue sitting and talking about personal matters.

25.

The audit system had no safeguard to prevent employees from deleting or altering audit information.

26.

Brooks put audits in the system, and they were deleted or removed.

27.

White employees would have group conversations that excluded Brooks and would work around him and not tell him what was happening with the machinery.

28.

Riester gave Brooks his probation reviews. During the reviews, Riester said that other teammates complained about him and/or did not like him, but he would not give more details, say who it was, or provide feedback on how to improve.

29.

Riester falsely stated that Brooks did not "show[ ] urgency or attention to detail when it comes to equipment stops, general alarms, daily sanitation, or engagement when team mates are trouble shooting."

30.

Brooks frequently asked for help and training, but it was not provided to him because Riester believed that black employees should be lower-level and not advance to Level 5 as easily or to the same extent as white employees.

31.

White technicians were given preference on training and opportunities for growth and development.

32.

A white technician, Jesse Sornes, advanced to a Level 4 Technician while Brooks was still employed by General Mills.

33.

Brooks and Sornes were both manufacturing technicians in the Flake Department, worked on the same team, and worked the same shift.

34.

Brooks and Sornes shared the same supervisors and decisionmakers who were responsible for their promotions and training.

35.

Sornes was provided more training and opportunities than Brooks.

36.

Brooks and other black technicians (including a male employee named Lorzeno) were required to perform more work than white technicians, including Sornes and Reister.

37.

White supervisors and technicians would frequently be sitting around talking about personal things when work needed to be done, and Brooks and other black technicians were required to perform the work or be punished.

38.

Lorenzo was a Level 2 Technician, and white supervisors failed him on his Level 3 test at least once before finally awarding it. Meanwhile, Sornes never failed any of the tests to advance to the next level.

39.

White employees such as Sornes were given study guides to aid in their preparation for the tests required to advance to the next level. Black employees were not given those study guides.

40.

A Level 5 Technician on another shift gave Sornes the answers to the test he took to advance to Level 4.

41.

Brooks asked Sirmans about whether he could take the test to advance to Level 1, and Sirmans said, "What's the point?"

42.

Sirmans and other supervisors had decided that Brooks would be terminated because he had complained about the lack of training and would not keep his mouth shut about unfairness.

43.

To follow up on prior verbal requests for training and prior verbal complaints about not receiving sufficient training, Brooks gave his supervisor a written complaint about insufficient training.

44.

Sirmans and Riester read the letter about not receiving training.

45.

Two days after providing the written complaint about training, Brooks was terminated.

46.

HR Representative Mandy Calloway, Sirmans, and Korpi were present at the termination meeting.

47.

Brooks told them that Riester refused to train him, and he was not properly trained on audits; Sirmans said that Brooks was trained properly.

48.

The three white HR member and supervisors told Brooks that he was unable to do basic tasks and strongly insinuated that he was incompetent.

49.

Brooks asked if they read the letter complaining about training; Sirmans and Korpi said that they read it but downplayed its relevance. Calloway had not read the letter and appeared surprised supervisors were aware of a written complaint

about a lack of training by an employee being terminated for allegedly not knowing how to perform basic tasks.

50.

In his termination meeting, Brooks said that his audits had been taken out of the system.  He was told that he was the only person at the Covington facility who had that problem.  However, Brooks found out later that other black employees had audits removed from the system as well.

51.

Calloway, Korpi, and Sirmans were all well-aware that audit, payroll, and other software was not secure, so white employees could, and frequently did, alter the system to negatively affect black employees.  The white employees would then deny the altered the system, accuse the black employees of lying, and gaslight them into doubting their good faith recollection of the duties they performed.

52.

Brooks was told that he was being terminated because he was "unable to demonstrate appropriate improvement in [his] ability to complete the basic expectations of the Technician role during [his] probationary period."

53.

Riester refused to train Brooks on his job duties or audits, and Sirmans did nothing in response to Brooks' complaints that he was not getting training opportunities.

54.

Similarly situated white employees, including those who performed more poorly than Brooks, were treated more favorably than Brooks due to his race.

55.

Brooks' supervisors discriminatorily assumed that he was incapable of performing the work when, in reality, he was not given the same training or other opportunities as white employees.

56.

When Brooks complained about the disparate treatment he was receiving with training, he was discriminatorily and retaliatorily terminated.

## DECISIONMAKER AFFILIATION WITH GOOD OLE BOYS

57.

Korpi is a known member of and participant in the Good Ole Boys, an organization with members who are united and motivated to act in concert specifically for the purpose of engaging in intentional race discrimination.

58.

The Good Ole Boys work together to engage in intentional race discrimination because doing so gives themselves and their white friends job security.

59.

The Good Ole Boys hold black employees to a higher standard and require them to follow rules to a far greater extent than that expected of white employees. This allows white employees to, on average, work and get written up, terminated, or otherwise punished far less than black employees.

60.

General Mills opened the West Plant of a food manufacturing facility in Covington, Georgia, in 1988.  It opened the East Plant in 1992.

61.

The Covington facility manufactures cereal and trail mix pieces.

62.

Jack Gilliam and Greg Cantrell, both of whom are white men, previously worked together for a different employer and were early hires at the Covington location.

63.

Gilliam and Cantrell worked at, and quickly gained control over the management of, the East Plant.

64.

Over the years, Gilliam and Cantrell's influence spread to the West Plant.

65.

Gilliam and Cantrell harbor discriminatory beliefs towards people of color and women. For instance, Cantrell, who called black people "colored" well beyond the 1990s, also told a black employee that "women should be at home having kids."

66.

Gilliam and Cantrell help white employees move up through the ranks at a much higher speed than black employees.

67.

Gilliam and Cantrell used their control and influence at the Covington facility to cause General Mills to take actions that aggrandized and enriched themselves and their white friends.

68.

Gilliam used his control and influence to move Korpi quickly through the ranks from an entry level technician, to TTL, to Platform Lead, much quicker than black employees.

69.

Korpi was also close to Phil Thompson.

70.

In separate litigation pending in this Court – the case of *Conrad James v. General Mills Operations, LLC,* Case No. 1:23-cv-01560-SCJ-RDC – a then-current HR employee of General Mills, Angela Williams, testified that the Good Ole Boys is an organization that she was warned about when she first started working at General Mills' Covington location.

71.

Williams gave names of members of the Good Ole Boys and identified Phil Thompson as a member and someone who she personally observed treat black employees differently and more negatively than white employees.

72.

To maintain control and influence in a manner that allows them to use the Covington facility as their own enterprise, Gilliam, Cantrell, and other Good Ole Boys members only allow like-minded individuals who "toe the line" to be in management, HR, or other leadership positions.

73.

The Good Ole Boys have used members and friends in HR positions – supported by the legal team of a multi-billion-dollar company – to adopt policies and take actions that allow the Good Ole Boys to treat white employees more favorably than black employees in a way that reduces the risk of liability findings in discrimination cases and reduces the risk of paying unemployment benefits (even though General Mills' success in unemployment cases has nosedived in recent months).

74.

To maintain the ability to keep Cantrell, Gilliam, Korpi, and other racist white employees in positions of power, the Good Ole Boys have used numerous methods to intimidate black employees.

75.

Korpi shared the white supremacist ideology of the Good Ole Boys and used his supervisory position to force black employees to perform the work of less-qualified white employees.

76.

At least three other General Mills employees have accused Korpi of race discrimination and retaliation regarding his efforts to force black employees to perform more work than white employees and to manufacture evidence to terminate them. (*See* Case No. 1:24-cv-02409-MLB-JKL, Doc. 30 at 105-110 (Naaman Smith), 118-120 (Gary Davis), & 121-128 (Devahn Jefferson)).

77.

Korpi was eventually demoted from his Platform Lead role, apparently because of the vast and consistent allegations of misconduct made against him in this Court.

*Allegations of Korpi's Intentional Discrimination by Naaman Smith.*

78.

Smith, a black male, worked for General Mills as a technician for about 7 years.

79.

In 2020, Smith, who has a bachelor's degree, was passed over for a promotion to TTL in favor of John Dean, a less-qualified white male who is suspected by multiple black employees to be unable to fluently read or write. John Dean was pre-selected for the position by the white decision makers for the TTL roles and any application process was a sham.

80.

Around 2021, Korpi became Smith's Platform Lead on a team that included Gary Davis and John Dean.

81.

Around August or September 2023, Smith reported to his direct supervisor, Korpi, that he believed he was being targeted. Smith thought he was being targeted because his positive performance was not recognized by Korpi to the same degree as John Dean; John Dean would not work overtime; John Dean openly made derogatory comments about Korpi to his face in front of other employees;

John Dean openly made homophobic remarks about a gay technician; and Korpi nitpicked Smith and G. Davis even though Dean did not perform all of his job duties.    Korpi assured Smith that there was no problem, and Smith should continue to do what he had been doing.

82.

Throughout his career at General Mills, white employees made stereotypical comments about Smith.  Comments were made that he knew what jail was like, saying he would need a gun because he lives in Decatur (in an affluent area), and made comments about his dreads.

83.

By the time Smith told Korpi he believed he was being targeted, Korpi had continuously held Smith and G. Davis, a fellow black male technician, to a higher standard than other white employees, including John Dean, for standards and policies related to job performance, completing paperwork, and other conditions.

84.

John Dean, a white TTL, frequently sat and did not work.  However, Dean was favored by Korpi, so Korpi held Davis and Smith responsible for the work that Dean was not performing.  Davis and Smith's job duties took longer than they otherwise would because they also had to perform Dean's duties.

20

85.

In October 2023, Korpi took photographs that he claimed showed Smith and Davis signed off on paperwork stating that equipment was clean when it was not. One photograph was of a tote on a clean floor; Korpi claimed Smith and Davis had committed a policy violation, and Korpi had cleaned up the tote before taking the picture. In other words, Korpi did not have any evidence of a policy violation.

86.

Nonetheless, Smith and Davis were terminated on October 13, 2023.

87.

Korpi manufactured evidence and gave a false statement for the purpose of having Smith and Davis terminated.

88.

The reason given for Smith's termination (document falsification) was false, did not follow the progressive discipline policy, and was pretext for intentional race discrimination. Around the time of Smith's termination, at least one white technician in the Puff Department (Ashley Larrimore) was also accused of document falsification and was not terminated. As such, the reason provided by Korpi was simply pretextual and the real reason for Smith's termination was his race.

*Allegations of Korpi's Intentional Discrimination by Gary Davis.*

89.

G. Davis, a black male, worked for the Covington facility for approximately 1.5 years.

90.

Around the summer of 2023, G. Davis overhead Korpi and several other employees discussing manufacturing evidence to terminate an employee on FMLA leave, Devahn Jefferson, a black male employee.

91.

G. Davis told Jefferson the conversation he overheard, Jefferson reported it to HR, and HR interviewed G. Davis, telling him his statement would be confidential.

92.

Shortly after speaking with HR about Jefferson in August 2023, Korpi told G. Davis that he heard that he had complained about him to HR. Korpi then began harassing him.

93.

Korpi added questions to the test G. Davis had to take to advance to a Technician Level 3 that were not required of white employees. Shortly thereafter,

G. Davis failed the test because of the additional questions that were not required of white employees.

94.

Korpi and other white supervisors, including Will Coady and Jeff Pierce, worked in concert to intentionally make tests harder for black employees, causing many black employees to fail the tests and be denied or delayed promotions. These same individuals gave answers to white employees and did not require them to demonstrate proficiency in all areas required of white employees.

95.

This testing disparity became so well-known at the Covington facility that it was referred to commonly as the "testing scandal" or "training scandal."

96.

Dozens of complaints by black employees about the testing/training scandal did nothing to correct the problem. Instead, discrimination litigation by Conrad James and the class action eventually pressured General Mills to ban Coady and Korpi from testing and training, which was never even a legitimate job duty of Korpi.

97.

When G. Davis asked Korpi for training help, the request was denied. However, when a white employee asked for training, Korpi took him off his regular team and placed him with another technician to better learn the system. G. Davis asked for the same treatment, and that request was denied.

98.

John Dean, a white TTL, frequently sat and did not work. However, Dean was favored by Korpi, so Korpi held Davis and Smith responsible for the work that Dean was not performing. Davis and Smith's job duties took longer than they otherwise would because they also had to perform Dean's duties. For instance, Korpi required G. Davis to sweep the floor and do a hot water rinse of the cooker that Dean operated. G. Davis was not paid extra for performing Dean's job duties. Korpi required G. Davis and Smith to do Dean's job duties on the basis of race. Despite G. Davis and Smith doing more than Dean because of Korpi's racism, they were all paid the same wage or Dean was paid more.

99.

In October 2023, Korpi took photographs that he claimed showed Smith and G. Davis signed off on paperwork stating that equipment was clean when it was not. One photograph was of a tote on a clean floor; Korpi claimed Smith and Davis

had committed a policy violation, and Korpi had cleaned up the tote before taking the picture. Korpi did not have any evidence of a policy violation.

100.

Nonetheless, Smith and G. Davis were terminated on October 13, 2023.

101.

Korpi manufactured evidence and gave a false statement for the purpose of having Smith and G. Davis terminated due to their race.

102.

The reason given for Smith's termination (document falsification) was false and pretext for intentional race discrimination. Around the time of Smith's termination, at least one white technician in the Puff Department (Ashley Larrimore) was also accused of document falsification and was not terminated.

103.

Korpi was the decisionmaker for Larrimore as well.

*Allegations of Korpi's Intentional Discrimination by Devahn Jefferson.*

104.

On or about January 10, 2022, Jefferson began working for Defendant.

105.

Jefferson first started trying to get a job with General Mills in 2016. Jefferson went through a series of three interviews with all white men and was not hired. He applied another time after the first interview and was not given an interview. When Jefferson interviewed the second time, the interviewer was a black man. The interview was less intense and less hostile, and Jefferson was given the job.

106.

A white male employee, J.J. (last name unknown), was hired one month before Jefferson. Nonetheless, Jefferson was pressured to take his Level 2 test at a particular seniority benchmark (i.e. 6 months), and J.J. was not required to take it at that time.

107.

Around July 2022, Jefferson was written up for a mistake that was made by his white trainer, Ashley Larrimore, a white female. At first, Jefferson's intermittent supervisor, Andrew Atkins, was planning to only write Jefferson up for the mistake, but Jefferson pointed out that he was in training and the white trainer was responsible for it. As a result, Jefferson and Larrimore were both written up and put on a corrective action level. This write-up caused Jefferson to not get a raise for a year. The write-up did not cause Larrimore to miss a raise.

108.

Jefferson was also not given the same amount of training given to white employees. If an employee failed an advancement test, they have to wait before they can take it again, and, if they fail it enough, you can get fired. Jefferson was pressured to take his test quickly, but white employees were given as much time as they wanted.

109.

Around June 2023, Jefferson took intermittent FMLA leave allowing him to miss three workdays per week.

110.

In August 2023, shortly after Jefferson's brother passed, G. Davis told Jefferson about a conversation he overheard Korpi, Huffman, Ramos, and Stephen (last name unknown) were discussing ways to get Jefferson fired. At the time, Jefferson's supervisors were Danny Thompson and Phil Fain.

111.

Stephanie Ramos physically touched Jefferson on several occasions and made him uncomfortable. Jefferson began to avoid her because of the touching. Ramos told his supervisor, Phil Thompson, that Jefferson was not engaged and did not want to be at work.

112.

In August 2023, Jefferson reported the situation with Ramos and all individuals involved in the conversation that G. Davis overheard to Mandy Calloway, then to corporate HR.  Jefferson reported that he believed he was being targeted for taking intermittent FMLA leave because of his race.  White employees who took leave were not targeted and did not suffer adverse employment actions as a result.

113.

After Jefferson reported the conversation to HR, the individuals involved in the conversation overheard by G. Davis distanced themselves from Jefferson, which he initially welcomed.

114.

In November 2023, Jefferson's uncle passed.  The company gave bereavement leave and FMLA leave.  Jefferson's direct teammates did not have an issue with Jefferson taking leave.  However, Huffman and Korpi frequently made comments about Jefferson being out of work, being lazy, or trying to take advantage of the system.

115.

Shortly after the report to HR in August 2023, Huffman and Korpi frequently threatened Jefferson with write-ups related to his uniform or PPE. If Huffman or Korpi saw Jefferson, they would nitpick his uniform and PPE, threaten to write him up, or report him to his actual supervisor, Danny Thompson. At that time, Huffman was a Technician; Korpi was a TTL **in a different department**. Huffman and Korpi would nitpick Jefferson and report him to his supervisor to attempt to get him in trouble. Meanwhile, white employees were not written up for the same or more serious uniform or PPE violations.

116.

Thompson told Jefferson that Huffman and Korpi "had a hard-on" for him and wanted to get him in trouble. Huffman and Korpi did not put such effort into getting white employees in trouble.

117.

Around January 2024, however, Thompson passed away and Fain retired.

118.

After Thompson passed and Fain retired, Joe Huffman and Nicholas (last name unknown), both of whom were involved in the August conversation, became his supervisors.

119.

Joe Huffman made comments or asked questions about Jefferson's –

(a)    Smell.

(b)    Clothing.

(c)    Jewelry.

(d)    Vehicle.

120.

In Jefferson's presence, Huffman and Korpi made comments about Naaman Smith's dreadlocks being "nappy" or gross.  They also made comments about Smith's clothes and hygiene.  Huffman and Korpi did not make comments about white employee's hair, clothes, or hygiene.

121.

Huffman and other white employees asked various stereotypical questions, such as how Jefferson was financially able to obtain his vehicle and why he wore jewelry and certain clothing.

122.

Jefferson personally witnessed Korpi blame G. Davis and Smith for issues that John Dean was responsible for, and he personally witnessed Korpi give credit to Dean for G. Davis and Smith's successes.  Some examples of this included

changeovers, startups, and troubleshooting.  Jefferson also personally witnessed numerous occasions where G. Davis, Smith, and another black employee were sweating and working hard, and Dean was not working, looking at his phone, and/or watching TV.  Dean frequently left for break when something challenging arose; black employees were not allowed to do that.

123.

Several months after his supervisors changed, Jefferson was told that he had falsified a document and slowed down production two weeks before the issue was brought to his attention.

124.

Jefferson's supervisor told him the machine was "80% clean" and it delayed production.  Later, Jefferson was told by HR representative Mandy Calloway that he only cleaned 20% of the machine.  Jefferson disputed that he did not fully clean the machine or that he falsified a document.  Calloway stated that Georgia is an at-will state, and he could be fired for any reason.  His termination was based on his race.

125.

By the time he was terminated on or about March 4, 2024, Jefferson had been nitpicked for months for:

(a) Breaks – John Dean would not be called back from break for any reason, but Jefferson was required to cut his breaks short if a white manager wanted him to do the work.

(b) Cell phones – it was acceptable for white employees to be on their cell phones, but not Jefferson. John Dean was able to openly be on his cell phone; Korpi would write-up or counsel Jefferson, or report him to his supervisor, Thompson, if he saw him on his phone.

(c) PPE – John Dean would only have earplugs and a helmet on talking to Korpi without an issue, but Korpi would nitpick Jefferson if he did not have earmuffs or eyeglasses on and fitted perfectly. Korpi also would not counsel or reprimand other white employees for PPE perfection, including one of Korpi's family member (believed to be son-in-law or stepson).

(d) Jewelry – Jefferson was not permitted to wear jewelry, but a white employee, Rick (last name unknown), was allowed to put bandaids over his earrings.

126.

Jefferson was not trained to clean the machine that he was terminated for not cleaning. The white comparator, Ashley Larrimore, who engaged in the same conduct, had been trained on the machine, was a trainer, and was not terminated.

127.

Larrimore was also a manufacturing technician, worked in the same department, and had the same supervisors and decisionmakers are Jefferson.

128.

Jefferson was passed over for promotion in favor of less-qualified white employees at least twice since he began his employment with General Mills. White employees with little to no qualifications are routinely given positions over black employees by Korpi and other Good Ole Boys members.

## FURTHER EVIDENCE OF GOOD OLE BOYS' RACIST DISCRIMINATORY INTENT

129.

The Good Ole Boys believe that Confederate imagery intimidates black people, indicates white superiority, and subjugates black employees.

130.

The Good Ole Boys believe that history and symbols that have been co-opted or misappropriated by the Ku Klux Klan and other white supremacist hate

groups are useful to keep black people "in their place" and discourage black people from speaking or taking action against the disparate treatment of black employees at the Covington facility.

131.

In 2005, the Good Ole Boys caused Defendant to commission a depiction of Stone Mountain from Good Ole Boys member James Spitzer with official General Mills characters portraying Confederate Generals:

(a)    Sonny the Cuckoo Bird (Cocoa Puffs) as Jefferson Davis;

(b)    Chef Wendell[1] (Cinnamon Toast Crunch) as Robert E. Lee; and

(c)    Buzz the Bee (Cheerios) as Stonewall Jackson.

132.

Some Black employees refer to the depiction of Stone Mountain as the "Confederate Mural."

133.

This is a picture of the Confederate Mural:

---

[1] Chef Wendell is a former mascot of Cinnamon Toast Crunch.



134.

The Confederate Mural was approximately twelve feet tall and more than twenty feet wide and was displayed from approximately 2005 until 2021 at the East Plant, just outside of a production area where black employees were required to pass every day.

135.

Gilliam, Cantrell, and Phil Thompson were all responsible for or supportive of the Confederate Mural specifically because, to them, it symbolized the superiority of white people and justified the Good Ole Boys' treatment of black employees.

136.

The production area is just to the right of the orientation of the photograph in the above picture.

137.

Good Ole Boys member James Spitzer created several t-shirts depicting a boulder or rock with "Covington" written below it and, in at least one iteration, a General Mills flag on it.

138.

Upon information and belief, several of these t-shirts contain symbols intended to convey white supremacist ideas.

139.

This is one example of a t-shirt design:



140.

Another example includes Chef Wendell holding a chain connected to the neck of a rabid dragon-looking animal with red eyes and a spade tail:



141.

Black employees have been required to wear these t-shirts at certain times and events.

142.

Gilliam, Cantrell, Phil Thompson, and Korpi are long-time members of the Good Ole Boys

143.

Gilliam and Cantrell successfully created the cushy work environment for himself and his white friends by forcing black employees to perform well beyond their fair share of the work.

144.

This model of two separate employment contracts and realities for white employees and Black employees has worked in making Covington extremely profitable and generating around $1 billion in revenue each year – it has also exploited Black employees for over 30 years.

145.

John Henderson was closely affiliated with Gilliam, Cantrell, Thompson, and other Good Ole Boys members and was the site safety manager with authority over East and West Plants.

146.

Here, Henderson is pictured displaying the "okay hand gesture," which was recognized by black employees as a racist gesture designated a hate symbol

by the Anti-Defamation League.  Upon information and belief, Henderson was not terminated.



147.

The hand signal displayed in the above paragraph is intended to covey the letters W and P, which represent "White Power."

148.

Corporate HR was also notified of B.J. Marks displaying the okay hand gesture in this photograph.



149.

Gilliam, Cantrell, Phil Thompson, Korpi, Henderson, Marks, and other Good Ole Boys in the highest levels of management and HR subscribe to white supremacist ideology and look out for other Good Ole Boys members who have and demonstrate the same beliefs by carrying out disparate negative employment actions against white employees.

150.

White supervisors and technicians make the okay hand gesture while at work to communicate solidarity and unity against black employees.

151.

The Good Ole Boys' requirement of a white supremacist ideology ensures that current white employees and their families and friends have well-paying jobs with few requirements because the Good Ole Boys act in concert to enforce a scheme to treat black employees differently than white employees.

152.

Good Ole Boys members identify themselves to like-minded employees with symbols that have been misappropriated by the KKK and other hate groups, such as the okay hand gesture, the Gadsden flag, and "the Confederate flag."

153.

As evidence of Defendant's pattern and practice of discrimination, and to show motive and intent, Plaintiff alleges that Defendant:

    (a)    Did not and does not uniformly require white employees to comply with policies, procedures, job descriptions, or advancement standards to the same extent or degree as that required of black employees.

(b)    Construed and applied policies, procedures, job descriptions, and advancement standards in a more onerous and tedious way against black employees than as to white employees.

(c)    Systematically held black employees to a higher standard of conduct by writing them up and taking adverse employment actions against them at a higher rate and for less-serious infractions than white employees.

(d)    Put black employees in circumstances and environments that set them up for write-ups and other adverse actions under the auspices of "doing a favor" or "being a team player," such as:

    (i)    Pressuring black employees to falsely sign off on inspection reports to allow production to begin quicker than appropriate, or

    (ii)    Having black employees work in areas where they are not trained under the pretense of said employees doing a favor or being a team player –

    then later taking adverse action against that employee related to that exact action for "violating policy."

42

(e)     Provided benefits for underperforming – and, often, racist – white employees by:

    (i)     Giving them false performance evaluations with incorrect and inflated positive information and without correct information regarding negative behaviors or actions.

    (ii)    Using false information to give promotions and bonuses to white employees.

    (iii)   Using false information to select black employees for demotion instead of underperforming white employees in so-called mass demotions.

    (iv)    Removing negative information from white employees' personnel files.

    (v)     Not holding white employees to the same performance standards as Black employees.

    (vi)    Hiring or promoting white employees into positions for which they are not qualified to the detriment of more qualified Black employees.

(f)     Gave false performance evaluations to black employees to justify adverse employment actions.

(g)    Coordinated among each other to take adverse employment actions against black employees based on false and manufactured evidence.

(h)    Received information about complaints of race discrimination from local and corporate HR to then use as the basis to target black employees with baseless adverse employment actions.

(i)    Maintained a quota of black employees who "toe the line" and do not complain about disparate treatment of black employees to allow the Good Ole Boys to maintain control of the Covington facility and, to the furthest extent possible, avoid liability in discrimination lawsuits.

(j)    Gave white employees answers to test questions required for advancement and did not require them to complete the hands-on requirements.

(k)    Made up job positions and gave less onerous job descriptions with fewer responsibilities to white employees.

(l)    Reserved desirable positions, such as those in the maintenance department, for white employees other than a minimal quota of black employees vastly disproportionate to the number of black technician-level and temporary employees.

(m)    Hired and promote white applicants who are objectively less qualified than black applicants.

(n)    Threatened black employees with demotions and pay reductions.

(o)    Empowered racist white employees to harass and mistreat black employees.

(p)    Implemented tools that will later be used in HR decisions and federal employment litigation to justify disparate treatment of Black employees, such as the Coaching and Counseling Database ("CC Database").

(q)    Created hostile work environments for black employees.

(r)    If black employees complained of racist conduct, black supervisors created reciprocal hostile work environments and otherwise targeted the complaining black employees in retaliation for complaining of racism and/or that they were the victims of racially motivated adverse employment actions.

(s)    Retaliated against black employees who made complaints of racism and/or that they were the victims of racially motivated adverse employment actions.

154.

Gilliam, Cantrell, and Korpi and the Good Ole Boys force black employees to do more work for less money and benefits, and create job stability for often less-qualified and lazy Good Ole Boys members and their friends,[2] by using this model:

(a)   First, with the intention to limit the advancement of black employees who do not follow Good Ole Boys' instructions or engage in too much "back talk," Good Ole Boys refuse to train, safeguard information from, and intentionally incorrectly train black employees;

(b)   Second, even though the Good Ole Boys are responsible for training lower-level black technicians, they nonetheless use write-ups, entries in the CC Database, and delayed promotions to:

   i.   Punish black employees for not being fully trained; and

   ii.   Intimidate them into performing more work than their white counterparts because even the technician positions are considered well-paying for the area.

(c)   Third, the Good Ole Boys make it very clear to black employees that questioning or opposing racially discriminatory or hostile conduct are

---

[2] The Good Ole Boys do not see it this way; instead, they believe that Black people advancing in the company is "reverse discrimination" against white employees.

swiftly retaliated against – this happens via nitpicking and manufacturing evidence, which Chris Morrison, the (until recently) head of local HR, has personally taken part in, and that Megan Asturias in corporate HR has personally taken part in covering up.

## **COUNT ONE**

### 42 U.S.C. § 1981:  Race Discrimination

155.

Plaintiff repeats and realleges each and every allegation above as it set forth herein in full.

156.

Pursuant to the Civil Rights Act of 1866 –

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a).  This provision applies to nongovernmental discrimination.  *Id.* at § 1981(c).

### 157.

General Mills has knowingly allowed white supervisors and decision makers who are members of a fraternal white supremacist organization, "the Good Ole Boys," to operate the Covington facility in a manner that systematically discriminates against Black employees by not providing them the same employment opportunities as white employees

### 158.

Brooks' supervisors were aware that he was not being provided training but held him accountable as if he were.

### 159.

Brooks' supervisors were aware that Riester was responsible for Brooks' training and advancement, and that Riester was racist and believed that black employees deserved to be in lower technician levels.

### 160.

Brooks' supervisors did not want him to continue to work at General Mills because he was vocal about unfair circumstances, including training.

161.

Korpi, as decisionmaker, harbored discriminatory intent and has demonstrated that intent through his continuous disparate treatment of black employees and his willingness to manufacture evidence to terminate black employees who complained about Korpi mistreating them.

162.

Brooks would not have been terminated but for his race because white employees are provided training and given the benefit of the doubt, along with additional chances, when they struggle to perform adequately.

163.

Plaintiff asserts a disparate treatment claim pursuant to 42 U.S.C. § 1981.

164.

The actions by General Mills described in this Count amount to an ongoing and continuous violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981.

165.

Plaintiff is entitled to an award of damages against Defendant in an amount equal to all monetary and non-monetary losses he suffered.

## COUNT TWO

### 42 U.S.C. § 1981:  Retaliation

166.

Plaintiff repeats and realleges each and every allegation above as it set forth herein in full.

167.

Brooks engaged in a protected activity when he complained about disparate training practices to his supervisors.

168.

Sirmans and Korpi harbored discriminatory intent and acted on that by denying Brooks training and terminating him as if his failure to know how to perform his job was his fault – instead, the entire situation was manufactured to get rid of a black employee seen to be problematic by the Good Ole Boys.

169.

Complaints about training are common among black employees and have been common for over a decade.  These complaints have been ignored by local and corporate HR.

170.

Merely two days after Brooks complained about not being trained, he was terminated.

171.

The white supervisors in the termination meeting, Korpi and Sirmans, specifically admitted to knowing about the written complaint about training.

172.

In retaliation for Plaintiff's complaints, Defendant took materially adverse actions against him, including not providing training to Brooks but nonetheless terminating him for not allegedly not knowing how to perform his job.

173.

Plaintiff asserts a retaliation claim pursuant to 42 U.S.C. § 1981.

## COUNT THREE

### 42 U.S.C. § 1981:  Hostile Work Environment

174.

Plaintiff repeats and realleges each and every allegation above as it set forth herein in full.

175.

Plaintiff was discriminated against and harassed based on his race by General Mills' supervisors and coworkers, including Korpi, Sirmans, Riester, and Sornes.

176.

The white supervisors and coworkers' discriminatory statements, threats, and conduct were unwelcome, sufficiently severe or pervasive, detrimentally affected Plaintiff, were viewed as subjectively hostile and abusive by Plaintiff, and would be viewed as objectively hostile and abusive to a reasonable person.

177.

The white supervisors and coworkers' refusal to train Plaintiff was part and parcel to the intentionally discriminatory racially hostile work environment.

178.

Plaintiff complained about this discrimination and harassment, and General Mills had actual or constructive knowledge of the ongoing discriminations and/or the harassing conduct was undertaken by and/or condoned by General Mills employees in management roles.

179.

Defendant failed to take prompt and appropriate remedial action to prevent or correct further discrimination and harassment of Plaintiff.

180.

Plaintiff assert a hostile work environment claim pursuant to 42 U.S.C. § 1981.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands a TRIAL BY JURY and the following relief:

(a)    Declaratory judgment that General Mills violated Brooks' § 1981 rights;

(b)    Temporary and permanent injunctive relief, along with this Court's oversight for a reasonable duration, disbanding the Good Ole Boys, holding racist technicians and decisionmakers accountable, and implementing lawful employment practices that give employees the full benefit of employment at General Mills without regard to race or other protected characteristics;

(c)    Full back pay from the date of Brooks' termination from the company taking into account all raises to which Brooks would have been

entitled but for Defendant's unlawful activity, and all fringe and pension benefits of employment, with prejudgment interest thereon;

(d)    Reinstatement or front pay to compensate Brooks for lost future wages, benefits, and pension;

(e)    Full amount of financial losses caused to Plaintiff as a result of the racist employment practices at the Covington facility;

(f)    Compensatory damages in an amount to be determined by the enlightened conscience of the jury for Plaintiff's emotional distress, suffering, inconvenience, mental anguish, loss of enjoyment of life, and special damages;

(g)    Award of costs and expenses of this action, together with reasonable attorney and expert fees;

(h)    Punitive damages in an amount to be determined by the enlightened conscience of the jury sufficient to punish Defendant for its conduct toward Plaintiff and deter Defendant from similar conduct in the future;

(i)    Judgment against Defendant for damages incurred by Plaintiff;

(j)    Judgment against Defendant in an amount to fully and adequately compensate Plaintiff;

(k)     An award of pre-judgment and post-judgment interest;

(l)     A trial by jury on all issues triable to a jury; and

(m)     Other and further relief as the Court deems just and proper.

Respectfully submitted this 4th day of April 2025.


By:     /s/ Douglas H. Dean
        Georgia Bar No. 130988
        Attorney for Plaintiff
        Dean Thaxton, LLC
        601 E. 14th Avenue (31015)
        Post Office Box 5005
        Cordele, Georgia 31010
        T:  (229) 271-9323
        F:  (229) 271-9324
        E:  *doug@deanthaxton.law*


By:     /s/ Linda G. Carpenter
        Georgia Bar No. 111285
        Sharon L. Neal, Esq.
        Georgia Bar No. 536060
        Attorneys for Plaintiff
        The Brosnahan Law Firm
        31 Lenox Pointe, NE
        Atlanta, GA 30324
        T:  (404) 853-8964
        F:  (678) 904-6391
        E:  *lgc@brosnahan-law.com*
        E:  *sharon@brosnahan-law.com*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Local Rule 7.1(D), I hereby certify that the foregoing AMENDED COMPLAINT has been prepared with 13-point Book Antiqua font, which is one of the font and point selections approved by this Court in Local Rule 5.1(B).

This 4th day of April 2025.

BY:   /s/ Douglas Dean
         Georgia Bar No. 130988
         Attorney for Plaintiff
         Dean Thaxton, LLC
         601 East 14th Avenue (31015)
         Post Office Box 5005
         Cordele, Georgia  31010
         T:  (229) 271-9323
         F:  (229) 271-9324
         E: *doug@deanthaxton.com*

## CERTIFICATE OF SERVICE

I hereby certify that I have this date electronically filed the foregoing AMENDED COMPLAINT with the Clerk of Court using the CM/ECF system which will automatically provide notice of such filing via electronic mail to all attorneys of record.

This 4th day of April 2025.

By:    /s/ Douglas Dean
       Georgia Bar No. 130988
       Dean Thaxton, LLC
       Attorney for Plaintiff
       601 East 14th Avenue (31015)
       Post Office Box 5005
       Cordele, Georgia  31010
       T:  (229) 271-9323
       F:  (229) 271-9324
       E:  *doug@deanthaxton.law*